UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAM'BRI SEAN JOHNSON, SR.,<br><br>  Petitioner,<br><br>  v.<br><br>GARY SWARTHOUT, Warden<br><br>  Respondent. | Case No.  11-2443 JST (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Jam'Bri Sean Johnson, challenging the validity of a judgment obtained against him in state court.[1]  Respondent filed an answer to the petition.  Petitioner has filed a traverse.

## I.  PROCEDURAL HISTORY

In 2008, a San Mateo County jury found petitioner guilty of three counts of forcible rape, two counts of forcible sodomy, and one count each of forcible oral copulation and forcible penetration by a foreign object.  (Resp. Ex. 1 at 483-86.[2])  The jury also found true an

---

[1] Petitioner initially named A. Hedgpeth, former warden of Salinas Valley State Prison, as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Gary Swarthout, the current warden of California State Prison – Solano, where petitioner is currently incarcerated, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer.

enhancement based on personal use of a deadly weapon during the commission of all offenses. (Id.) Petitioner was sentenced to state prison for 35 years to life, plus an additional determinate term of 72 years. (Id. at 1015; Ex. 2 at 1028-31.)

Petitioner directly appealed the judgment in the California Court of Appeal. In conjunction with the direct appeal, petitioner filed a state petition for a writ of habeas corpus. On September 21, 2010, in a reasoned opinion, the California Court of Appeal affirmed the judgment and denied the habeas petition. (Ex. 3.) On December 21, 2010, the California Supreme Court summarily denied the petition for review. (Ex. 4.) The instant petition was filed on May 19, 2011.

## II. STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[3]:

> The victim, identified at trial as Nadia, was 14 years old in April 2004 and was a freshman at East Palo Alto High School. She lived with her parents and brother in a ground-floor apartment in East Palo Alto.
>
> On April 3, 2004, Nadia went to a party with friends. She returned home before midnight and went to bed. Her bedroom window was closed and locked and the blinds were drawn.
>
> Nadia awoke early the next morning to find her mouth and eyes covered, and a man in her room. She tried to speak, but couldn't. She began to cry. The man got on the bed and told her, "[I] don't want to hurt you, Shut up." Nadia felt a knife on her throat. The man said, "Shut up or I'll kill you." Because her eyes were covered she could not see who the man was.
>
> The man asked Nadia if she had any money, and whether she "had any hair in [her] pussy." He pulled off Nadia's sweat pants, ripped off her underwear, and pushed her legs forward until her knees were bent by the side of her face. The man was too big and strong for Nadia to resist. The man inserted his penis into Nadia's vagina. The penetration caused Nadia pain.
>
> The man then partially inserted his penis into Nadia's anus. This penetration caused pain. The man then penetrated Nadia's vagina again, causing further pain because he was "pushing it really hard." The man raped Nadia repeatedly and told her not to move, and that he did not want to hurt her. He pressed his knife several times against Nadia's body.

---

[3] This summary is presumed correct. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

2

She felt the knife against her throat.  Nadia feared for her life.  Her family had not come to her aid during the attack, and she feared they were dead.

The man finished the sexual attack and got off Nadia.  He told her, "[I]'ll see you at school."  He also told her to give him five minutes to get away.

When she heard the man leave, Nadia pulled off the tape that was covering her eyes and mouth.  She went into the living room and saw that the sliding glass door was open.  Nadia called her friend Monica and told her about the rape.  She also woke her parents and told them.

Monica arrived and saw Nadia crying and pacing the floor.  Monica called the police after discovering pieces of duct tape and ripped underwear in Nadia's bedroom.

Nadia was examined by a nurse about 7:30 that morning, and by a forensic nurse practitioner the following day.  Both examinations revealed extensive tearing and other injuries to the genital and anal areas caused by blunt force trauma-such as penile penetration-and consistent with forcible penetration and nonconsensual sex.  The forensic nurse practitioner testified the injuries showed forcible penetration "without a doubt."  In addition, Nadia's face, arms and hands bore multiple superficial incised wounds, caused by a sharp object with clean edges.  She had grey sticky residue on her face, which appeared to be tape residue.

Semen found on a swab of Nadia's anus and in a stain on her bedroom carpet matched [petitioner's] DNA profile.  [Petitioner's] skin cells were found on Nadia's comforter.

Nadia testified she did not know [petitioner], did not give him permission to enter her bedroom, and did not consent to having sex with him.

[Petitioner] testified.  He admitted having sex with Nadia, but claimed the sex was consensual.  On April 3, 2004, he was almost 26; it was the day before his birthday.  He saw Nadia as she was walking down the street.  He stopped his car to talk to her.  According to [petitioner], Nadia told him she was 17.  [Petitioner] asked her to leave with him.  She said she had plans for the evening.  [Petitioner] asked if they could meet later.  Nadia pointed out her apartment and her ground floor bedroom window.  According to [petitioner], he went to Nadia's window around 1:30 the next morning.  She let him into her room, and they had consensual vaginal, oral, and anal sex.  Then [petitioner] went home.

[Petitioner] also presented the testimony of two women with whom he had relationships.  Both testified [petitioner] never forced them to perform any sexual acts.  But both also testified they were minors when they first slept with [petitioner].

The jury rejected the consent defense and convicted [petitioner] of three counts of forcible rape (Pen.Code, § 261, subd. (a)(2), counts 2, 4, and 6[4]); two counts of forcible sodomy (§ 286, subd. (c)(2), counts 5 and 7); and one count each of forcible oral copulation

---

[4] Except as otherwise specified, all statutory references herein are to the California Penal Code.

3

(§ 288a, subd. (c)(2), count 3) and forcible penetration by a foreign object (§ 289, subd. (a)(1), count 8). With regard to each offense, the jury found that [petitioner] personally used a deadly weapon (§ 12022.3, subd. (a)).

People v. Johnson, No. A124656, 2010 WL 3687509 at *1-2 (Cal. Ct. App. Sept. 21, 2010) (footnotes omitted).

### III. DISCUSSION

A. <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Penry v. Johnson</u>, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." <u>Williams</u>, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its

4

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. (Ex. 4.) The Court of Appeal, in its opinion on direct review, addressed three of the four claims petitioner raises in the instant petition. (See Ex. 3.) The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). As to the claim for which there is no reasoned opinion available, the United States Supreme Court has clarified that the absence of reasoning does not prevent application of the standard of review set forth in § 2254(d). See Harrington v. Richter, 131 S. Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.")

B.  Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) he was provided with an incomplete or inaccurate transcript on appeal; (2) his waiver of his right to trial counsel was involuntary; (3) his trial counsel was ineffective; and (4) the trial court erred in denying his motion for new trial. The Court addresses each claim in turn.

//

//

//

5

1. Transcript on Appeal

Petitioner claims he was denied "a full and accurate reporter's transcript." (Petition at 6, 17-20.[5]) Specifically, petitioner claims the court reporter failed to transcribe portions of his colloquies with the trial court, occurring on November 25, 2008 and December 1, 2008, at which time petitioner was representing himself. (Id.; Ex. 2 at 636, 731-33.) These colloquies involved petitioner's request to introduce DVD interviews between the victim and detectives. (Id.) While petitioner claims the trial court denied the request (Petition at 20), the record shows that the trial court allowed one such DVD interview to be played for the jury and admitted into evidence. (Ex. 2 at 773-76, 833-36, 866.)

Although there is no due process requirement that states allow direct appeals of criminal convictions, if state law does permit such appeals, due process and equal protection require that indigent criminal defendants be provided with free transcripts for use in the appeal, or other effective means of obtaining adequate appellate review. Britt v. North Carolina, 404 U.S. 226, 227 (1971); Griffin v. Illinois, 351 U.S. 12, 18-20 (1956) (per curiam). A court need only provide an indigent defendant with "a record of sufficient completeness" to prepare an appeal; irrelevant or extraneous portions of the transcript may be omitted. Mayer v. City of Chicago, 404 U.S. 189, 194-95 (1971). Two criteria are relevant in determining the need for the missing record: (1) the value of the transcript to the defendant; and (2) the availability of alternative devices which would fulfill the same function. Madera v. Risley, 885 F.2d 646, 648 (9th Cir. 1989). A habeas petitioner also must establish prejudice from the lack of the record to be entitled to habeas corpus relief. Id. at 649.

Here, the Court need not decide whether petitioner was provided with "a record of sufficient completeness" on appeal because petitioner fails to establish prejudice from the purported lack of recordation of his colloquies regarding the DVDs. See Madera, 885 F.2d at 649. Specifically, in his direct appeal and state habeas petition, petitioner never challenged the trial court's ruling on the admissibility of the DVDs. Petitioner raised no claim whatsoever relating to

---

[5] The page numbers used herein for the Petition refer to those affixed to the top of the page by the Court's electronic filing program.

the DVDs. Nor does he establish that he would have raised such a claim had it not been for the purported inaccuracy of the transcripts. Indeed, petitioner admits he did not receive the transcripts until November 18, 2010 (Petition at 18), i.e. after conclusion of the direct appeal.

Further, petitioner does not allege the necessary prejudice from any missing transcript because he does not explain the value of such transcript to his conviction. In this case, the value of the missing transcript is presumably that it would enable petitioner to make a claim based on erroneous exclusion of evidence. To establish prejudice, petitioner must show that there is some likelihood that the claim would be successful. For petitioner's claim to be successful, he must show there is a reasonable likelihood that admission of the excluded DVDs could have affected the judgment of the jury. See Penry, 532 U.S. at 795; see also Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (habeas court must assess "probative value of the excluded evidence"). Without any indication of the content, weight, or impact of the DVDs on petitioner's conviction, there is no showing that petitioner could have any success with his claim even if he could show the transcript was somehow incomplete.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2. Waiver of Counsel

Petitioner claims his waiver of his right to counsel at trial was involuntary. (Petition at 6, 21-31.)

The Court of Appeal rejected this claim as follows:

> [Petitioner] only briefly argues that the trial court erred by granting his self-representation request because [petitioner] did not make a knowing and intelligent waiver of his right to counsel. The record belies this argument. The trial court thoroughly explained to [petitioner] the pitfalls and consequences of self-representation, questioned [petitioner] on basic elements of evidence law, and made it very clear [petitioner] was ill equipped to conduct his own trial. Nevertheless, [petitioner], obviously thinking he could do a better job than his attorney, proactively chose to represent himself. His decision was based on a knowing and intelligent waiver of his right to counsel.

People v. Johnson, 2010 WL 3687509 at *8.

A criminal defendant has a Sixth Amendment right to self-representation. Faretta v. California, 422 U.S. 806, 832 (1975). A defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of

7

securing delay. Faretta, 422 U.S. at 835; United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994); Adams v. Carroll, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989). Before a trial court may allow self-representation, it must conclude that the defendant has "knowingly and intelligently" waived his underlying right to counsel. Faretta, 422 U.S. at 835. Consequently, the Sixth Amendment requires that a state trial court, before letting an accused proceed pro se, be assured that he "is made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" Snook v. Wood, 89 F.3d 605, 613 (9th Cir. 1996) (quoting Faretta, 422 U.S. at 835). The best practice is for the trial court to have "a discussion with the defendant, in open court and on the record, of the critical elements and risks of self-representation." McCormick v. Adams, 621 F.3d 970, 977 (9th Cir. 2010).

Petitioner claims that his wavier of rights in his request to represent himself was involuntary because it was forced upon him by the trial court's failure to appoint substitute counsel. (Petition at 21.) The predicate for this argument has not been established, however, because petitioner never requested substitute counsel. Rather, the record shows that on November 24, 2008, the trial court held a hearing outside the presence of the jury to discuss conflicts that had arisen between petitioner and defense counsel. (Ex. 2 at 337-38, 379-80.) During the hearing, the following colloquy took place:

[Court]: [W]hat is the issue please?

[Defense Counsel]: Well, the issue is essentially the same one that occurred at the end of the session last Thursday. During the break, and in the midst of my cross-examination of Ms. Torres, [petitioner] had a method of and series of questions that he wanted me to ask Ms. Torres that totally contravened my approach . . . . And he is very adamant and has a strong opinion that his approach is the correct approach.

And it's very difficult for me, if not impossible, to go forward with cross-examining all these very critical witnesses, and have – in the end, then having [petitioner] . . . have a bunch of questions that he wants me to ask that may be contradictory toward what I am trying to do. . . .

So, he and I had a discussion briefly during the break, the extended break. I explained to him the options that he would have, one of them including – would be self-representation. And he indicated that he – what he really wants to do, and I told him that would be problematic, not the self-representation necessarily, but what he really wants to do is have

8

>me question the various witnesses, then if he feels I've left out anything or not done it the way he wants it done, he could then ask his own questions. . . .
>
>[The Court]: Is that acceptable to you?
>
>. . .
>
>[Defense Counsel]: No.
>
>[The Court]: In other words, Mr. Johnson, you want co-counsel status?
>
>. . .
>
>[Petitioner]: Yes. I think that would be the easiest solution to the problem. But I have recognized that might not work for [defense counsel]. I am prepared, if need be, to represent myself.

(Petition Attach. RT at 381-82.)

The trial court denied petitioner's request:

>[The Court]: I'm denying [petitioner's] request for co-counsel status.
>
>Now, are you thinking you wish to represent yourself, Mr. Johnson?
>
>[Petitioner]: Yes.

(Petition Attach. RT at 388-89.)

In sum, the record shows that petitioner never requested new counsel. Rather, petitioner requested co-counsel status with existing trial counsel and requested self-representation as an alternative.

Further, the record demonstrates a fully knowing and voluntary waiver of counsel. At the November 24, 2008 hearing, petitioner notified the trial court that he wanted to represent himself. (Petition Attach. RT at 382, 389, 400.) Petitioner was expressly informed by the trial court, and acknowledged he understood, that he: (1) was facing "multiple life sentences"; (2) "there [were] significant risks attendant to [his] request"; and (3) "self-representation is unwise." (Id. at 392.) The trial court further advised petitioner that he would be required to follow the same rules that govern attorneys, he would not receive any special privileges, the court could refuse a later request for re-appointment of counsel, and petitioner would lose the right to appeal on the grounds of inadequacy of counsel. (Id. at 392-95.) Petitioner acknowledged understanding of all these risks.

(Id.) Additionally, petitioner signed a written waiver form. (See id. at 407-08.) In view of the clear record, the Court of Appeal reasonably concluded that petitioner's waiver was knowing and voluntary.

Accordingly, petitioner is not entitled to habeas relief on this claim.

3. <u>Ineffective Assistance of Counsel</u>

Petitioner claims trial counsel was ineffective because counsel failed to: (1) request dismissal of a burglary enhancement; (2) adequately impeach prosecution witnesses; (3) call certain defense witnesses; and (4) object to instances of purported prosecutorial misconduct. (Petition at 6, 33-52.)

The Court of Appeal rejected this claim as follows:

> [Petitioner] lists numerous aspects of his trial counsel's conduct of the trial which [petitioner] claims amounted to ineffective assistance. We need not discuss them in detail. They appear to be matters falling well within the legitimate tactical decision making of trial counsel. Significantly, [petitioner] does not present a declaration from his trial attorney stating that the challenged conduct was not tactical. And *Strickland* teaches us that "[j]udicial scrutiny of counsel's performance must be highly deferential." (*Strickland*, *supra*, 466 U.S. at p. 689.) It is not for this court to second-guess counsel's performance with the hindsight of a Monday morning quarterback. (*Ibid.*)
>
> None of the cited items of alleged substandard performance could possibly have prejudiced [petitioner]. The evidence of his guilt is overwhelming.

<u>People v. Johnson</u>, 2010 WL 3687509 at *7-8.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. <u>Id.</u> at 687-88. Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

10

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697.

A "doubly" deferential judicial review applies in analyzing ineffective assistance of counsel claims under 28 U.S.C. § 2254. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011). The rule of Strickland, i.e., that a defense counsel's effectiveness is reviewed with great deference, coupled with AEDPA's deferential standard, results in double deference. See Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010). Put another way, when § 2254(d) applies, "the question is not whether counsel's actions were reasonable[;] [t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011). Moreover, because Strickland's standard for assessing defense counsel's effectiveness is a "general" one, state courts have "greater leeway in reasonably applying [that] rule," which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." See Cheney, 614 F.3d at 995 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Petitioner fails to satisfy either prong of the Strickland test. First, petitioner cannot establish ineffectiveness. A review of the record supports a finding that counsel's actions could have been based on reasonable tactical decisions. See Harrington, 131 S.Ct. at 788 ("The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.")

Further, petitioner cannot show he suffered any prejudice by reason of counsel's alleged errors. In particular, he fails to explain why the jury likely would have reached a different result absent the alleged errors. Indeed, once petitioner's request to represent himself was granted, nothing barred him from seeking dismissal of the burglary enhancement, asking questions he

wanted to pose to prosecution witnesses[6], calling defense witnesses, and objecting to the prosecutor's alleged misconduct. "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" Savage v. Estelle, 924 F.2d 1459, 1466 (9th Cir. 1990) (quoting Faretta v. California, 422 U.S. 806, 834-35 n.46 (1975)). Because petitioner ultimately represented himself at trial, the performance of counsel who had represented him before then is largely irrelevant, and he cannot complain about the quality of the defense he mustered for himself. Strickland makes clear that the ineffectiveness inquiry is made in relation to the trial that actually occurred. Unless counsel had done something that irreparably damaged petitioner's case, any misstep by counsel is largely irrelevant because it could have been corrected later by petitioner. Petitioner has not shown that counsel caused him to lose the opportunity to file any motion that would have succeeded in making any difference to his defense. Nor has petitioner shown that counsel did anything else to irreparably damage his case.

Finally, as noted above, the Court of Appeal found there was considerable evidence of petitioner's guilt such that it cannot be said "the result of the proceeding would have been different" had counsel not committed the alleged errors. See Strickland, 466 U.S. at 694. The record supports this conclusion.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.   New Trial Motion

Petitioner claims the trial court erred in denying his motion for a new trial based on newly discovered evidence. (Petition at 53-63.)

The Court of Appeal summarized the background of this claim as follows:

> The jury returned its guilty verdicts on December 8, 2008. [Petitioner] filed a motion for new trial based on newly discovered evidence. The purported new evidence involved alleged sexual conduct between Nadia and another man which predated the rape. Because Nadia had told officers investigating the rape that she had been a virgin before she was assaulted, and her claim of virginity had been presented to the jury, [petitioner] argued the

---

[6] Indeed, at the November 24, 2008 Faretta hearing, the trial court specifically informed petitioner that the prosecution witnesses had not been released from testimony and could be recalled. (Petition Attach. RT at 344.) Further, as noted above, petitioner was allowed to play a DVD interview of the victim that he sought to admit as impeachment evidence.

prior sexual conduct-meaning she was not in fact a virgin-was material to her credibility.

[Petitioner] supported the motion with a declaration from San Quentin inmate Dedrick "Ricky" Sevier. Sevier was an inmate of the San Mateo County Jail on December 12, 2008-four days after the guilty verdicts-when he overheard two other inmates talking about [petitioner's] recent rape conviction. One of the two inmates was [petitioner's] cellmate. Sevier heard the inmates identify the rape victim as "Nadia" with the same last name as a girl Sevier had dated in high school in 2003 and 2004. Sevier told the two inmates "that I had slept with Nadia in early 2004 before she said she was raped." [Petitioner's] cellmate asked Sevier to tell [petitioner] this information "since Nadia had said she was a virgin before she was raped."

Sevier spoke with [petitioner] about Nadia later that day. Sevier had never met [petitioner] and had not known he was on trial for the 2004 rape of Nadia.

According to Sevier's declaration, he met Nadia in the fall of 2003 when they were both freshmen at East Palo Alto High School. "In January, 2004, Nadia and I began to go to my house after school, and we had sexual intercourse about ten times during early 2004." Nadia called him on his cellphone between 4:00 and 5:00 the morning of the rape, and said she had been raped by a " 'Mexican guy' " who came through her bedroom window. Two to three weeks later, Nadia and Sevier went on a school camping trip where they again had sexual intercourse. During this encounter, Sevier gave Nadia some "hickeys." Later, school officials noticed the hickeys and "had a meeting about them at school," attended by the principal, a teacher, Sevier's grandfather, and Nadia's father.

After Sevier spoke with [petitioner] about his prerape sexual conduct with Nadia, Sevier spoke to [petitioner's] investigator Scott Williams. Sevier told Williams about the prior sexual conduct, and identified Nadia from a picture Williams showed him.

[Petitioner] also supported his new trial motion with a declaration of Scott Williams. According to Williams, [petitioner's] mother called him on December 16, 2008, and asked him to contact [petitioner] at the jail. Williams met with [petitioner] two days later. [Petitioner] told Williams that Sevier had information about Nadia.

Williams met with Sevier at the San Mateo County Jail on December 26, 2008. Sevier repeated to Williams his information, described above, about having sex with Nadia in early 2004, giving her " 'hickeys' " on the camping trip, and attending the meeting at school after the hickeys were noticed. Williams confirmed the camping trip story with a teacher at the school.

Sevier told Williams he did not meet [petitioner] until December 12, 2008, when they met in the jail four days after the rape verdict. Sevier repeated his story of overhearing the two inmates talking about the rape victim being named Nadia, and then talking to [petitioner] that same day.

Williams declared he "[c]ould not, with due diligence, have discovered that Nadia was not a virgin at the time of the alleged rape, in time to present it at trial. I was not made aware of the information until December 26, 2008, which was after the jury's verdict had been issued...."

13

The People responded that Sevier's evidence was not newly discovered: the defense was aware before trial that Nadia had had a romantic relationship with a classmate named Ricky who had given her hickeys on a camping trip. Indeed, [petitioner] had filed a pretrial motion to admit evidence of the relationship, and the hickeys, as prior sexual conduct of a complaining witness under Evidence Code section 782. The People concluded that Ricky Sevier "was a person easily identifiable and available to have been interviewed not only prior to, but during the trial."

The People also argued that evidence of Nadia's prior sexual conduct would have been inadmissible under [California] Evidence Code section 1103, subdivision (c)(1), which excludes evidence of a rape victim's prior sexual conduct to prove consent.

In a supplemental declaration, Williams stated that he knew at the time of trial that Nadia may have been romantically involved with a classmate named Ricky, but that he did not know Ricky's last name, date of birth, or other identifying information, and had since learned that the boy's first name was not actually Ricky, but Dedrick. He also stated his belief that school officials would not have given him information enabling him to identify and contact a student. A school official stated in a separate declaration that school policy rendered the identity of students and their contact information confidential, and such information would not have been disclosed.

The trial court denied the motion for new trial:

"The [petitioner] could ..., with reasonable diligence, have discovered the evidence concerning Dedrick Ricky Sevier before the trial. I don't believe that the defense position is correct in that Ricky was ascertainable, and it is not, in fact, newly discovered evidence.

"Additionally, the evidence itself would not have been, in the Court's opinion, admissible as it relates to her prior sexual conduct. I don't think that was what the defense was attempting to use it for, but I wanted to make clear that it's highly unlikely that it would have come in under [Evidence Code section] 1103.

"With respect to the evidence in terms of impeaching the credibility of Nadia, which I believe is a defense theory on attempting to get it in, the Court finds that it would not impeach her in any significant way. If, in fact, it is newly discovered evidence, it doesn't entitle[ ] [petitioner] to a new trial, because it does not render a different result probable on retrial. It merely impeaches the testimony of what the Court believes is a highly credible complaining witness.

"Further, the experts' testimony as to her injuries established that they resulted from nonconsensual sex. In order for the newly discovered-I'll assume newly discovered evidence [-] to produce a different result on retrial, the jury would not only have to disbelieve the victim's testimony, but also disbelieve the testimony of the two prosecution experts who testified that her injuries were the result of nonconsensual sex.

//

//

14

> "Because this is not probable, in fact, it's highly unlikely, the [petitioner's] motion for a new trial is denied."

People v. Johnson, 2010 WL 3687509 at *3-5.

The Court of Appeal concluded that the trial court properly denied the motion for a new trial and ultimately rejected petitioner's claim:

> In ruling on a motion for new trial based on newly discovered evidence, a trial court considers the following factors: (1) the evidence, not just its materiality, must be newly discovered; (2) the evidence must not be merely cumulative; (3) the evidence must be such as to render a different result probable on retrial; (4) the defendant could not with reasonable diligence have discovered and produced the evidence at trial; and (5) the facts must be shown by the best evidence of which the case admits. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) The trial court is entitled to consider the credibility, as well as the materiality of the evidence, in determining whether it was reasonably probable that retrial with the new evidence would lead to an acquittal. (*Id.* at p. 329.) We review the trial court's ruling on a new trial motion for abuse of discretion. (*Id.* at p. 328.)
>
> The parties spend considerable time arguing whether the evidence of Sevier's story could have been discovered with reasonable diligence prior to trial, and thus whether it was in fact newly discovered. We need not tarry over the issue. Even if the evidence were newly discovered, it would not have led to a different result in [petitioner's] trial.
>
> The evidence of Nadia's prior sexual conduct was inadmissible under Evidence Code section 1103, subdivision (c)(1) on the issue of consent. Under certain limited circumstances, it could have been admitted under Evidence Code section 782 on the issue of her credibility. (See *People v. Rioz* (1984) 161 Cal.App.3d 905, 914919 (*Rioz* ) [discussing the inherent tension between the two statutes].) Under Evidence Code section 782, [petitioner] would have been required to make a sworn offer of proof concerning the relevance of the prior sexual conduct to Nadia's credibility as a complaining witness. The trial court would have then reviewed the offer and determined, in its broad discretion and also with regard to Evidence Code section 352, whether the evidence was sufficient and more probative than prejudicial. (See *Rioz*, supra, 161 Cal.App.3d at p. 916.) But it is highly unlikely the evidence would have been admitted because this case is not a simple "he said, she said" credibility battle, but a case where physical evidence supports the victim's testimony of forcible sex. (See *id.* at pp. 916917 [prior sexual conduct inadmissible under Evid.Code, § 782; evidence victim was beaten supported her testimony of nonconsensual sex].)
>
> Nadia had residue of tape on her face and her underwear was ripped. Two experts testified her genital and anal injuries were consistent with nonconsensual sex. The trial court, in denying the new trial motion, not only found Nadia a "highly credible" witness, but aptly noted that the jury, to reach a different result, would not only have to disbelieve Nadia, but also disbelieve the experts. The court found this "highly unlikely." Simply put, whether Nadia was or was not a virgin on the early morning of April 4, 2004 had little to do with

//

>the fact that [petitioner] forcibly raped and sodomized her. She was a credible witness and her testimony was more than substantially supported by the physical evidence and expert testimony.
>
>The motion for new trial was properly denied.

People v. Johnson, 2010 WL 3687509 at *5-6 (footnote omitted).

Petitioner's claim is unavailing, for the reason that petitioner has not stated a cognizable federal claim.

"[R]elief may not be granted [under § 2254] unless the state court adjudication 'resulted in a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" Bobby v. Mitts, 131 S. Ct. 1762, 1763 (2011) (quoting 28 U.S.C. § 2254(d)(1)). "[I]t is the habeas applicant's burden to show that the state court applied [clearly established federal law] to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

Petitioner has not cited to clearly established Supreme Court precedent holding a federal habeas petitioner has a right to a new trial. Indeed there is no such authority. Rather, as the Supreme Court has observed, "[c]laims . . . based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding," see Herrera v. Collins, 506 U.S. 390, 400 (1993), such as, for example, "ineffectiveness of [trial] counsel" or "withholding of evidence by the prosecution," see Schlup v. Delo, 513 U.S. 298, 314 (1995). "[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." Herrera v. Collins, 506 U.S. at 398 (internal quotation and citation omitted).

Further, the record supports the Court of Appeal's conclusion that the evidence would not have rendered a different result probable on retrial. There was significant physical evidence and other evidence that petitioner forcible raped and sodomized the victim, rendering her truthfulness about her virginity insignificant to the verdict. In sum, the state court's rejection of this claim was not contrary to clearly established Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d).

Accordingly, petitioner is not entitled to habeas relief on this claim.

C. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Gary Swarthout on the docket as the respondent in this action.

**IT IS SO ORDERED**.

Dated: April 4, 2013

JON S. TIGAR
United States District Judge